Good morning, Your Honors. May it please the Court. My name is Victoria Clark and I represent the petitioners in this case. The issues in this case go to the very heart of the Clean Water Act and what is required to protect water quality. This is not a situation where EPA has merely exercised its discretion and gets deference. There are legal requirements that the Court can and should decide. Inletkeeper challenges EPA's decision to reissue a general permit for oil and gas facilities in Cook Inlet. These facilities operate in an aging oil field that produces more pollution as produced water and less oil, and those pollutants are toxic. Currently, 5 million gallons a day of produced water is discharged. There is no limit in the permit on the volume of this discharge, which will continue to increase. And Cook Inlet is the only place in the country where these discharges are allowed. EPA violated the Clean Water Act by authorizing less stringent discharge limits, and in doing that, EPA used blatantly inaccurate computer modeling results, and there is no evidence in the record to support EPA's discharge limit calculations. Well, Counsel, it seems that you've gotten the attention of EPA. They're here to request that this matter be remanded so they can take another look at their permit. Why shouldn't we allow that to happen? Well, Your Honor, the remand actually goes to the legal deficiencies that occurred for one part of the issues here, which are the water quality-based effluent limitations. It's not a complete remand. And even if the remand were to be allowed, it shouldn't be allowed and have the permit remain in effect. The legal deficiencies here are such that if the remand is going to be allowed, it needs to occur and have this permit go away and the previous permit be reinstated. Do you have any authority for that proposition? Your Honor, it seems to me that we have to take the EPA at its face value when they come in and say that they want a remand so they can review the permit and take care of any deficiencies that might have been identified. Do you understand that to be their position, that they're going to take care of every conceivable problem? No. I understand that they want a partial remand, which only gets to the effluent limitations. I understand that. I think that's accurate. But what I don't understand is why shouldn't we allow that? Well, Your Honor, I think if there's a remand, it needs to be a remand of the entire permit, and it needs to be that they consider all of these legal issues. Because the legal issues that are here are ready to be decided, and the reason that they want the remand is to correct a legal deficiency that's basically at issue here. And if that's going to occur, then we're not just looking at those particular effluent limitations, but the entire permit is legally defective, and therefore it should be vacated and the previous permit reinstated. All right. Well, you have some specific concerns about portions of the permit beyond what EPA asks to have remanded. Yes. And so are you suggesting that it's up to us at this point to entertain those challenges, and if we agree with you, this would be added to the remand, but if we disagree with you, then we would affirm to that extent? Yeah, I guess if you disagree with me, you would affirm to that extent. But there's still the question of whether or not having those legal defects allows the entire permit to remain in place. Yeah, this is my question. Do you understand the motion to remand to be that the permit remains in effect and they just take care of the backsliding provisions, or do you understand that this permit, by sending it back even partially, that that would mean that this permit is vacated and the old permit is reinstated until this permit is okay? No, if they get the remand, they want this permit to stay in place. And, you know, another problem with that is that it's basically dictated the outcome already. They're saying we're going to fix the problem, and everything that's already there is in place, and so that nothing's going to change. So how does the public affect that? And that's a very result-oriented way of dealing with the problem when there actually could be things that need to change and that there should be those problems should be addressed, and then the permit should be changed overall. So with respect to the remaining, the other issues that go to other aspects of the permitting process, what is your strongest argument? What do you think the strongest position is? Well, I think the backsliding issue is definitely a strong one. I think that the issue of the technology-based effluent limits is a very important legal deficiency as well. The EPA failed to develop technology-based effluent limitations in this permit for various pollutants, and so for the limits that haven't been set by water quality-based effluent limits, EPA first looks to whether or not there are effluent limitation guidelines, and those guidelines are technology-based standards for industry-specific discharges. In this case, there are guidelines for the coastal subcategory for oil and gas extraction facilities, and those guidelines prohibit the discharge of produced water from all coastal oil and gas facilities in the United States except in the Cook Inlet, and the prohibition is generally referred to as zero discharge, and zero discharge is the practice of reinjecting this produced water, which is a very large part of the effluent, the toxic part of the effluent, so that it is not discharged into water bodies at all, and that zero discharge is considered best available technology that's economically achievable, which is required by the Clean Water Act, and with Cook Inlet as the only exception for these current facilities. So the technology is not incorporated into the limitations. So was that raised in the comments to the EPA by Cook Inlet? Yes, Your Honor. Can you tell me where? Well, our comments are extensive about the zero discharge requirement, and in having that argument, it was basically an argument that the permit writer exercises his best professional judgment to set those technology-based limits, and we're saying the technology-based limit is zero discharge. So it's basically the same issue. They could say, oh, well, we're not going to go to zero discharge, but there are these other technologies in place which would protect the water body from these toxic pollutants, and there are eight of them that were not considered in the effluent limitation guidelines when EPA promulgated those in 1996. So you're saying that by objecting to the zero or by contending that there should be zero discharge, that you have essentially raised the point that they should have technology-based limitations in the permit? Yes, Your Honor. Did you differentiate between those pollutants that are covered by the guidelines and those that are not so? And also, did you argue that those pollutants differed from the covered pollutants for oil and grease? In the comment period, you mean, or in the briefing? Well, at any time, because the issue here is waiver. Have you waived this plan? I couldn't point you exactly in our comments. I don't believe that we said these are the eight pollutants that weren't covered, but we did say that the best available technology that's economically achievable needs to be set for these particular toxics that are being discharged and produced water. And, you know, the standard for what needs to be raised in comments is that the agency needs to know what we're talking about. It's not that we have to have raised it in the exact same detail that we would necessarily raise it here to give you all the background you need. So what was the EPA's response to the requirement that there should be the requirement for zero discharge? They basically said, no, we don't have to do that because the effluent limitation guidelines apply and the oil and grease standard is the surrogate that's in place that will tell us that these toxic pollutants are being controlled. So that's the second legal issue that I think is very strong. And, actually, I think the whole case is very strong. The issue of the water quality-based effluent limits is, you know, a question of what EPA had to do for this modeling that's required. But isn't that a state law matter or not? No, it's not a state law matter, Your Honor. The state determines the mixing zones, and the mixing zones are not being directly challenged here. What is being challenged is that EPA was arbitrary and capricious in using the outcome from that model and the dilution values that they used in their calculations. And that's because the modeling was so obviously wrong for all of the reasons that we stated, that, you know, it was modeled as an ocean instead of an estuary. Cook Inlet is a very dynamic water body with the second most extreme tides in the world. Changes in salinity and stratification because of all the freshwater inputs from the rivers that come in and is a fjord-like channelization as you reach the head of the inlet. And so it's well established that Cook Inlet is an estuary, yet it was modeled as an ocean. And so the critical design features of an estuary weren't considered, and that includes slack tide, tidal reversal, various current speeds. And the slack tide is a really important point in the modeling that needs to occur for dilution purposes because you need to model for the time when there's the least amount of dilution that's occurring. And that would be slack tide because that's the time between when the tide's coming in, when the tide's going out, and there's not that much movement. So the pollutants are very concentrated there. And if you don't, if you're not modeling for that, then how are you getting the accurate dilution factor that EPA needs to determine whether or not there's reasonable potential for there to be an exceedance of water quality standards requiring an effluent limit or even what that effluent limitation should be. And so for those reasons, EPA was arbitrary and capricious in its decisions on the water quality-based effluent limits as well. And unless there's other questions, I'll save my last three minutes for rebuttal. Thank you. Good morning. My name is Daniel Pinkston. I'm with the Environmental Defense Section of the U.S. Department of Justice, representing the respondent's EPA and the EPA's administrator. With me here at the council table is Mr. Olmert, who is a supervisory attorney in EPA Region 10. We have 15 minutes per side, and we have agreed to allot five minutes of our time to the interveners. Your Honors, three arguments are essentially made by the petitioners in this case. They've each been discussed to some degree in the previous portion of the oral argument. The first is a claim that EPA improperly issued a general permit with certain limitations, effluent limitations, which were less stringent than in the prior 1999 permit. In order to allow what's called backsliding, inclusion of less stringent requirements, there must be a finding that the inclusion of the less stringent limits is in compliance with the state's anti-degradation policy, which is part of its water quality standards. Our motion for partial remand relates to only these less stringent limits, and the reason that we think a remand is appropriate in this case as to those limits is primarily because of a procedural problem in how the state issued its findings on whether or not the anti-degradation policy in state regulation had been met. If we were to grant your request to remand, what would likely happen? And also give me a timeline. How long would this remand be? Well, Your Honor, when we filed our motion, we had some consultations with the state, which are laid out in the motion and in the brief. And essentially the state had agreed that it would provide some interim implementation methods for how to actually use the state anti-degradation policy. They were going to do that, I believe, by September 1. That has been done. We filed a Rule 57 letter, which indicated that the state has now issued interim guidance on how to implement the anti-degradation policy. After that, the state would then provide a new analysis of these less stringent guidelines, put it out for public comment, and ultimately come out with a final decision on whether or not the state's anti-degradation policy would be met by inclusion of these less stringent guidelines. What happens to the permit during this period? We have argued that the permit should not be vacated. That we should have, it's appropriate to go back and re-examine the anti-degradation side of it because that's a requirement for the anti-backsliding provisions of the Clean Water Act. But under the case law, this is not the kind of situation where there should be a vacating of the current limit. So your request for remand doesn't really affect any of the other issues presented to us? We defend the other issues, the other parts of the permit. But they're before us on the merits, regardless of whether or not. Exactly. We're free to decide those in this proceeding, are we not? Certainly, Your Honor. We believe that on the merits that the petitioner's arguments are without merit. We do defend in full both the technology-based effluent limitations and the water quality-based effluent limitations. Well, why don't you talk a little bit about the modeling used? Because that troubled me. Well, the modeling used- I'm not speaking for anybody else. Well, what I should say is first that this relates to mixing zones. And as we discussed in our brief, mixing zones are a portion of the receiving water where water quality standards need not be met while the effluent is being diluted by the surrounding water body. Mixing zones are a creation of state law. They're part of the state water quality standards. EPA does not prescribe the mixing zones. The state is free to allow mixing zones or it doesn't have to allow mixing zones. In this case, Alaska has allowed the use of mixing zones. Well, then, is there a direct conflict with your opposing counsel's comment saying this is an EPA responsibility, not a state responsibility? Well, that's-we believe in the petitioner's briefing they sort of conflate these two things, EPA's responsibility and the state's responsibility. In the first instance, the state calculates the mixing zones that it would be appropriate under the state water quality standards. Now, EPA does have an obligation to assure itself in the end that water quality standards are met. That's the purpose, in reality, of the 401 water quality certification that the state has to issue before EPA can issue the permit. So the state actually did-well, I should say that there was consultation back and forth during the derivation of the mixing zones. The modeling comes in because the model is used as a way of predicting or determining how the dilution would occur from the outfall to the point where the state water quality standards would be met. The calculation of the mixing zones was done by the state here. Well, does that go-I didn't quite understand the core mix process, but I thought that there was an independent duty on the part of the EPA to- under the Clean Water Act to use modeling that reflects the actual conditions that are in Cook Inlet. Well, it's- The contention is that wasn't done. Well, the contention, I believe, of the petitioners is that the petitioners don't like the way the state used the core mix modeling. And what this comes down to in the end is that the petitioners would have done the modeling differently. They don't like the result. They think that as a scientific matter, other different kinds of inputs should have been used. But this really goes to the heart of this part of the case, and that is that the courts owe deference on these kinds of scientific matters to the agency. As we point out in our brief, the approach that was taken was rational. There wasn't a lack of consideration of the factors that the petitioners would have you believe are- make the analysis inappropriate. They would have decided it differently. And the whole point of deference in these kinds of cases is that as long as the agency- in this case, the state and EPA looking at these mixing zones- as long as there was a rational basis for it, it's not the court's part to say, you know, we would have considered this an estuary. We would have thought about the salinity differences. We would have thought about, you know, how fast the 90th percentile current is. But that's not the court's role in this kind of case, as we understand it, and as the cases, including Supreme Court cases, make very clear. This was a defensible analysis undertaken by the state, and EPA appropriately used it in issuing the permit- in this case, the water quality-based effluent limits. Now if I may speak for a few moments about the technology-based effluent limits. First of all, one of their chief arguments, which is that EPA could have ignored the established technology-based effluent limits, is because certain constituents found in the produced water in Cook Inlet were not specifically described in 1996 when these effluent guidelines were established by EPA. First of all, they did not make that argument in comments. That's our first point. Secondly, when you go back and look at the effluent limitation guidelines, the entire body of produced water was really considered. EPA said, we should use indicator pollutants for a number of reasons, because there are many, many different kinds of constituents in produced water, some of which are in such small quantities they're hard to analyze and so forth. This particular aspect, indicator pollutants, has been upheld, I believe it was by the D.C. Circuit. And in addition, although there is produced water discharges allowed in Cook Inlet, that was a focus of the ELG process back in 1996. And that very point was affirmed by the Fifth Circuit, that exact point. EPA is not able, nor should it, ignore its regulatory effluent limitation guidelines. They're there for a reason. And in particular, in Cook Inlet, it was determined that it was not economically feasible to require zero discharge. In this case, there was no basis for EPA requiring zero discharge when the effluent limitation guidelines directly and specifically address this particular waste stream in Cook Inlet. I see that my time... Well, one question, if we were to grant your request to remand, could we put time limits, for example, periodic reporting and a maximum remand time of, let's say, six months? Would EPA find that objectionable? Well, I just don't want to let this sit for another two years, it seems to me. How much longer does this permit have to expire? This permit will expire in July of 2012. So it's been in effect for three years so far. And it's very likely that the next permit iteration will be from the State of Alaska because it's taking over the permitting program. Now, that may change, but that's supposed to happen in 2011. But the Inletkeeper people certainly have the right to challenge the revised permit, which you would produce on remand. And I would be shocked if they didn't, Your Honor. Well, the point is, I would be very reluctant to let this be open-ended. Well... You haven't suggested a period is what I'm guessing. I would think that probably something like a year, maybe not that long. I mean, it's a very specific limited remand we're seeking here, about a very specific set of limitations and analyzing it under the state anti-degradation standard using these new implementation methods that the state has recently issued. I apologize. I've inhaled an allergen, so I'm suddenly stuffed up. But I am concerned about this. The argument I hear from the plaintiff is that if the remand is permitted, it should be permitted with the current permit set aside and the provisions of the former permit reinstated, except presumably for the expiration date. Could you first tell me your perspective on what the practical difference is? And second, why shouldn't that be what we do if we permit a voluntary remand? Well, for one thing, there are a number of differences between the 1999 permit and the current permit from 2007. Since the remand is so limited to these specific, I think it's five effluent limits which are less stringent, if any part of the current permit was to be vacated, it should only be those particular provisions. The permit itself is 120 pages long. This is a smaller target. There are other parts of the permit that are in controversy. We can't ignore that. They're in controversy, and the court may very well, I mean we certainly hope it upholds the balance of the permit on the merits, which we think is appropriate. But these particular, from our perspective, would be not judicious to vacate these current permit limits for two basic reasons. One is it might very well be that on remand the same permits would be approved again. And secondly, there has been some expectation built up by these operators who have been operating under this permit for three years. And the cases say it's basically a matter of the court's discretion whether or not to vacate in a situation like this. And we don't think, given this overall permit, that it is necessary or advisable to vacate any of the limits. If we were to vacate, what practical result does that have? Does that stop everything at that point, or does it automatically revert to an earlier permit? You mean just on this particular limited remand we're talking about here, or overall? Assume we decide entirely as the petitioner asks, then what? Well, I think what happens, well, again you're faced with the same issue of is it appropriate under the law to vacate a current permit when folks have expectations and it very well may be that you come back to the same limits after a remand. Well, let me ask you this, because the point that you have conceded in saying that there should be a remand is the point that has to do with the anti- how do you pronounce it? Anti-degradation. Degradation policy. And it seems to me that you seem to be saying that there should have been what? Well, the deficiency here was that when the state issued its draft anti-degradation analysis, it had a one-liner that said we find that this won't violate the anti-degradation standard. We think that that, and that was challenged by the petitioners, and we think that there is something in that, that the state should have included an analysis of why that conclusion was appropriate. That didn't happen. Now, in the end, at the final 401 water quality certification, the state did include a discussion of why these particular less stringent limits should be allowed and would not violate the state's anti-degradation policy. We think that what should happen at this point is that the state should include an analysis upon which petitioners and other portions of the public have the opportunity to comment. Right. And that goes as well to the effluent limitations in the permit, doesn't it, to some extent? The technology-based and the- Well, if you're going to take a look at the anti-degradation policy, that has to do with the question of limitations on effluents, doesn't it? I mean, isn't that part of creating it? The only reason here that it makes a difference, anti-degradation, is because some of the requirements are less stringent in the current permit. That's why an anti-degradation analysis was undertaken in this case. Yeah, I do understand that. It seems to me it's somewhat related to the question of effluent limitations and the question of incorporating technology-based limitations in the permit. And your position with that was that it's been waived. That's your first position. I just wanted to make sure that I understood your response to the point that they did argue that a best available technology should be applied. Well, they certainly- Except for the effluent limitations, and it hasn't been. They certainly argued that it should be zero discharge. They said it should be through best professional judgment by EPA. They did not include the argument that they raised now that because these particular constituents weren't considered during the derivation of the effluent limitation guidelines, therefore that gives EPA an ability to use best professional judgment and say, hey, despite what the ELGs say, it should be zero discharge. We think that particular point was not raised in comment. That particular point. That particular point. Your Honor, I hope- Yes, we'll- Thank you, Your Honor. Sorry. We'll give you some time. May it please the Court, Sven Brinderiksen here on behalf of the intervenors Chevron and XTO Energy. And I would start by saying that this appeal is a model of administrative law. There are two central elements of the appeal. The 401 certification is an issue of state law, and it is central to the issues that are presented. An appeal was filed of the 401 certification 18 months late and dismissed as untimely, and that decision was not appealed in the state proceedings. If you were to do the remand that's been requested, the result would not be to bring this case back to you, but to send it back to the state for a new administrative proceeding and another opportunity to reopen that 401 certification and challenge it on new grounds, issues that were not raised in the comments with the state, and that, you know, in essence to give a second bite of the apple to raise new issues as to the adequacy of the 401 certification in the state proceeding. So that you oppose any kind of remand at all? Absolutely. And then the related issue is the anti-degradation question, which goes to the issues under Section 303 of the Clean Water Act as to the adequacy of the state's water quality standards, which are reviewed every three years, have to be approved by EPA, and EPA has the authority to issue a water quality standard element that would apply to Alaska if they are dissatisfied with the state's program. Now, in essence, the objection that's been made about absence of anti-degradation procedures, the substantive anti-degradation issue, is an issue related to the adequacy of the state water quality standards under Section 303. The issue that should have been presented here is whether the permanent decision that's actually before this case is a decision made under Section 402 by EPA, and whether or not the anti-degradation analysis could actually be done without these implementation procedures. Now, if there was a problem in how the anti-degradation policy was applied here, I think that the petitioners would have been able to identify some flaw in the way in which the policy was applied to this permit. They identified no error in the way that the state applied the anti-degradation policy to this permit. They simply objected, as a matter of law, you shouldn't be able to make that decision without procedures. They identified no error in the way it was actually applied. Finally, on the remand, the basis for the remand, the partial remand requested by the state, it's an error alleged of state administrative procedure. EPA has decided that the state made an error of administrative procedure. They did not concede the merits of whether or not anti-degradation implementation procedures are needed to issue a 401 certification. What they did is they said, well, the state should have provided more opportunity for meaningful comment. And, you know, and here the folks have, they knew what the issue was. Is there a requirement of federal law? Yeah. All that is required of federal law is that the decision be identified so that the parties have an opportunity to provide comment. And, first of all, federal law wouldn't apply to the state certification. But even under the federal law standards, the state identified what its position was in its notice, its notice was adequate to tell the parties what the issues were that were presented. They knew what the issue was. They commented on an aspect of the issue. And the agency didn't change its position between its proposed and final action. And so it met the requirements. If you look at all of the cases cited by the parties as to what the notice requirement is for federal law, they did meet that requirement in the state proceeding. Any further questions? If the remand were to be granted but leave the permit in place, how would that affect your operations? The platforms will continue to operate in compliance with the permit or whatever set of permits is applied to them. Recognize that this permit will expire in July of 2012. We must begin working on the application development of information for the new permit cycle in the spring of 2011 in less than a year. And so, in essence, if you do a remand, we will be starting to work on the next permit cycle while that remand process is playing out. We'll give you some extra time. Well, you may ask me lots of questions, but I thought I would address mainly the backsliding issue and the modeling issue. You know, on the backsliding issue, the anti-degradation policy is legally defective because these implementation procedures are not in place. EPA has known about this for 13 years since they were put in place. And so, at the very least, should do its own anti-degradation analysis in determining whether to do this. They didn't do that. And the issues that are before the court, I mean, EPA has conceded the procedural problem, but they've impliedly conceded the substantive problem of not having the anti-degradation implementation procedures because that's the reason for the remand. Is this a 402 issue or a 401 issue? It's a 402 issue because they need that anti-degradation analysis to support any backsliding that occurs in the permit. And they allowed the backsliding. So, I mean, that's where they're going with this. And the 28J letter just, you know, shows how far along they are in that process, and it's a factual presentation. We've objected on that basis. As far as the modeling is concerned, it's really important here because what you have is you have a discharge pipe. The effluent comes out very polluted, very toxic. And there is a very large area. In the case of the 95% of the polluted produced water that's coming out, it has an over 2-mile long mixing zone. So what they've done is they've determined that they don't have to meet water quality standards until they're way out here. And there is no on-the-ground evidence of whether or not that is happening because no sampling is required at the edge of the mixing zone. So we have to rely on the modeling to tell us that they are going to meet the water quality standards there. And so, you know, saying we've conflated the responsibility here is EPA is doing that calculation for how those water quality standards are set and the effluent limitations. And if they don't have the right information, they can't do the right calculation. And we can't ensure that water quality is being protected. But these are all interrelated. They are all interrelated. And, you know, on the deference issue, you know, any one of these problems with the model makes it irrational. It's not based in reality. But in the aggregate, it is totally unreasonable. And the record doesn't support it. They didn't even put all of the model runs in the record, which shows all the problems that they had when they ran those models. So that's a big problem. And just finally on the technology-based effluent limits, you know, the problem there is the effluent limitation guidelines were promulgated 14 years ago. Region 10 has said they weren't looking at them again. And new facilities are required to meet zero discharge. The Osprey platform is meeting zero discharge out there. So EPA should have used best professional judgment to at least consider that. Thank you. The case just argued is submitted for decision. That concludes the court's calendar for this morning. And the court stands adjourned.
judges: Schroeder, O'scannlain, Clifton